No. 11,893.

MULLER v. THE PEOPLE.

Decided September 12, 1927. Rehearing denied October 17, 1927.

Plaintiff in error was convicted of vagrancy.

*Affirmed.*

On Application for Supersedeas.

1.   VAGRANCY—*Sufficiency of Evidence—Venue.* In a prosecution for vagrancy under section 6916, C. L., evidence reviewed and held sufficient to justify a jury in finding that the offense had been committed, and that it was committed in the county charged.

*Error to the District Court of Jefferson County, Hon. S. W. Johnson, Judge.*

Mr. JAMES R. HOFFMAN, Mr. CARLOS A. RICHARDSON, Mr. J. McD. LIVESAY, for plaintiff in error.

Mr. WILLIAM L. BOATRIGHT, Attorney General, Mr. WILLIAM W. GAUNT, Assistant, for the people.

*En Banc.*

MR. JUSTICE SHEAFOR delivered the opinion of the court.

The plaintiff in error will be designated herein as the defendant. Mrs. Muller, the defendant, was found guilty of vagrancy and sentenced to pay a fine of $200 and costs, and to thirty days' imprisonment in the county jail. She prosecutes this writ of error and applies for a supersedeas. Counsel have agreed that the case may be disposed of on this application.

The only question involved here, that requires consideration, is as to the sufficiency of the evidence to sustain the verdict of the jury that the offense charged was committed, and committed in Jefferson county.

The information charges: "That, on the 5th day of December, A. D. 1926, at the said county of Jefferson, state of Colorado, Edith Muller, being then and there a person able to support herself in some respectable calling, did unlawfully loiter and stroll about, frequenting public places, begging, and leading an idle, immoral and profligate course of life without any visible means of support."

It appears from the evidence that on the night of December 5, 1926, at the home of Jean Detergelon, in Jefferson county, the defendant was at a party, having gone there in an automobile with one Reeder. At the party were Detergelon, Reeder, Sprague and Drake. Reeder had taken several pints of whiskey in his car, some of which was found by the officers when they arrived upon the scene. The defendant was in the car at that time. Inside the house, when the officers entered, they found there had been what some of the witnesses described as "a battle royal," and some "a rough house." The table had been tipped over, dishes were scattered over the floor and things torn up generally. Defendant was the only woman present. The parties had all drunk of the liquor which Reeder had taken there in his car. There had been a fight in which the defendant was badly beaten. The parties resisted arrest and one of them stabbed one of the officers, but they were finally arrested and taken to jail. Prior to

the trouble at Detergelon's, defendant had been frequently seen attending dances, in the company of three or four men, at a resort in Jefferson county known as Rock Rest. Defendant resided sometimes at the Brown Palace Hotel in Denver, and at other times stopped at the Ellsworth Hotel. At the Ellsworth, she occupied a room adjoining another room occupied by Sprague. There was a door opening from one room into the other. She had received $500 from one of the men just a short time before the affair at Detergelon's; she had also received several thousand dollars from another man seventy years of age, and had received a few hundred dollars from still another man about eighty years of age. One of the men had given her an automobile. The defendant claimed that some of the money she had obtained from these men had been borrowed and some had been given to her; that she had borrowed the $500 mentioned. There was evidence tending to show that she had "hung around" the dance hall at Rock Rest, the witness explaining that by "hanging around" he meant she was "there at the dances, dancing and being around the place there;" that she never did any work although there was evidence tending to show that if work was a necessity for her, she was able to work. There was also evidence tending to show that she was in poor health and that she had not been able to work for some time. There was evidence tending to show that she was not compelled to work, by reason of an income which she received from an estate in France; that she had a monthly income of $500, although she admitted that she had said to Sheriff Johnson that she was receiving an income of $26,000 a year, or that she had such an estate coming to her. One of the officers testified that two nights previous to the trouble at Detergelon's, the defendant went to a dance at Rock Rest, starting from Denver with three men; that they stopped at the Rifle Range and one of the men got out. The others went on to Rock Rest; they were followed from Denver by the officer and he followed them

around at the dance hall. There was evidence tending to show that she would go and see one of the men from whom she obtained money; that she had stated that she went there at one time with another girl, and that this man would take pictures "of their legs and other things." The defendant, when asked why she needed to get so much money from men when she had an income such as she claimed, said that she "was keeping a lot of undesirable people such as Mrs. Macey, Mrs. Huffman and Germaine of Butte, Montana;" and that she had also helped one of the men out, the man who had beaten her at the Detergelon party, and she said at that time to Detergelon that this man was always beating her. When asked if the man who had beaten her was one of the undesirables that she had referred to, she answered, "Not exactly."

During the trial the defendant was frequently addressed, especially by her counsel, as Miss Astor, but whether she was, or claimed to be, a member of that distinguished family does not appear. It does appear, however, that during the period covered by the evidence, and at the time of the affair at Detergelon's, she was the wife of a man by the name of Muller, and she testified that she had loaned Muller, after they were married, $5,000; that she frequently received money from Muller to be credited upon his indebtedness to her. Defendant testified that somebody had accused her of being a dope fiend or a dope peddler and living an immoral life, defrauding the mails and blackmailing people, but she denied that such was the case. She said that one of the men had sent her money while she was in Chicago, to come back and go to Ireland with him; that he didn't take any pictures of her but wanted to. She further said that she was studying music and had been for some time, and had been spending a great deal of her money in that way. She was asked if she ever told Sheriff Johnson that she had an income of $26,000 a year and she answered that she was supposed to have that. She was then asked if she told him she had that coming. She

answered, "Well, perhaps I did," and that that was supposed to be a part of her inheritance.

This evidence seems to have been sufficient to convince the jury and the trial judge that defendant was guilty of vagrancy as charged. Had the Judge not been so convinced, he would have sustained the motion for a new trial.

From the evidence submitted, the jury was justified in believing and finding that defendant was an undesirable person in the community, who was able to work and support herself if need be, but who frequented public places in company with men, leading an idle life, without visible means of support except such as she obtained from men under the circumstances mentioned, and in reality depending for a livelihood upon money obtained from men through borrowing, or obtained through begging or some other improper means. They could, and it was within their province to, disbelieve her evidence concerning her income and expected inheritance, and could well believe that if she had the income which she claimed, it would be unnecessary for her to associate with men in the circumstances shown by the evidence, and obtain money from them by questionable methods.

The jury might well believe from this evidence that defendant's claim of fortune, and the nature and extent of her income, was a sham and a pretense, without foundation in fact, resorted to only for the purpose, and as a means, of extorting or otherwise obtaining support from her male companions and associates.

For, surely, the jury could believe from the evidence that a woman, leading a respectable life, actually able to work if necessary, having an income of $500 per month, with an expectancy of an estate of $26,000 or more, need not and would not frequent public dance halls, associate with men, as defendant was shown to have done, who either from brutal instincts or from overindulgence in intoxicating liquors, found it convenient, proper and desirable to beat, and otherwise mistreat, her.

The statute, under which defendant was prosecuted, § 6916, C. L. 1921, reads: "Any person able to work and support himself in some honest and respectable calling, who shall be found loitering or strolling about, frequenting public places, or where liquor is sold, begging or leading an idle, immoral or profligate course of life, or not having any visible means of support, shall be deemed a vagrant, and may be arrested and brought before any justice of the peace."

We think the evidence was sufficient to sustain the finding of the jury that an offense, within the meaning of the statute, was committed, and that it was committed in Jefferson county.

Supersedeas denied and judgment affirmed.